FILED
United States Court of Appeals
Tenth Circuit

November 2, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

HANS-GERD RASENACK, by and through
Jessica Tribolet, his duly appointed Guardian
and Conservator; and JESSICA TRIBOLET,
as duly appointed Guardian and Conservator
of Hans-Gerd Rasenack,

      Plaintiffs-Appellants,

v.

AIG LIFE INSURANCE COMPANY; and
AIG CLAIM SERVICES INC.,

      Defendants-Appellees.

No. 07-1521

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:06-cv-01525-WDM-MEH)**

John Case of Benson & Case, LLP, Denver, Colorado, for Plaintiffs-Appellants.

James D. Kilroy (Katrin Miller Rothgery and Jessica E. Yates with him on the
brief) of Snell & Wilmer L.L.P., Denver, Colorado, for Defendants-Appellees.

Before **BRISCOE**, **SEYMOUR** and **PORFILIO**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

This action arises under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* Hans-Gerd Rasenack seeks accidental paralysis and rehabilitation benefits from AIG Life Insurance Company, the insurer, and AIG Claim Services, the plan administrator (collectively, "AIG"). The district court reviewed the administrator's denial of benefits under an arbitrary and capricious standard and granted summary judgment for AIG. We reverse and remand.

**I.**

On May 21, 2003, Mr. Rasenack, then forty-eight years old, was struck as a pedestrian by a hit-and-run driver while saying goodnight to his friends in front of his home. The collision launched Mr. Rasenack approximately twenty-five feet through the air. He was severely injured and remained in a coma for approximately three weeks.

On June 6, 2003, Mr. Rasenack was transferred to Kindred Hospital. He was transferred again on July 7, this time to Craig Hospital, where he was admitted to a brain rehabilitation program. Mr. Rasenack remained at Craig Hospital until October 2003, and received outpatient treatment thereafter. Dr. Alan Weintraub, the Medical Director of the Brain Injury Program at Craig Hospital, served as Mr. Rasenack's regular treating physician throughout the course of his treatment. For the sake of clarity and brevity, we save the

remaining details of Mr. Rasenack's medical treatment for Part III of the opinion.

At the time of the accident, Mr. Rasenack was insured under an accidental death and dismemberment ("AD&D") policy issued to his employer, Marriott International, Inc., by AIG Life Insurance Company and administered by AIG Claim Services. Both the insurer and the administrator are owned by American International Group. Mr. Rasenack purchased the AD&D coverage through payroll deductions. In addition to accidental death and dismemberment, the policy provides an accidental paralysis benefit. At issue here is the policy's hemiplegia provision.[1] The policy defines "hemiplegia" as "the complete and irreversible paralysis of upper and lower limbs of the same side of the body." Aplt. App. at 359. The policy defines "limb" as the "entire arm or entire leg." *Id.* The policy does not define "paralysis." *Id.* The covered loss – *i.e.*, hemiplegia – must occur within one year of date of the accident.

The policy provides AD&D benefits for hemiplegia in the amount of one half of the principal sum. Mr. Rasenack's principal sum is $248,000. The policy also provides a rehabilitation benefit for expenses incurred within two years of the accident up to a maximum of $10,000. The rehabilitation benefit is only payable where the insured "suffers an accidental dismemberment or an accidental paralysis for which an Accidental Dismemberment or Paralysis benefit is payable

---

[1] The accidental paralysis provision also covers quadriplegia, paraplegia, and uniplegia.

under . . . the Policy." *Id.*

Jessica Tribolet, Mr. Rasenack's spouse and duly appointed guardian and conservator, filed a claim for AD&D and rehabilitation benefits on July 21, 2004,[2] asserting that Mr. Rasenack "suffer[ed] what the summary plan describes as 'loss of use' of both of his legs as well as his left arm." *Id.* at 624. The Plan provides that claims will be processed within ninety days unless special circumstances warrant an exception; it instructs that in no event will processing take longer than 180 days. These deadlines track the ERISA regulations. On November 15, 2005, sixteen months after Ms. Tribolet filed the claim, AIG denied it, concluding that Mr. Rasenack did not suffer from "hemiplegia" as defined by the policy.

Ms. Tribolet submitted a timely administrative appeal on January 13, 2006.[3] The Summary Plan Description ("SPD") provides that AIG will render a decision

_____

[2] The Plan advises claimants to notify the administrator within twenty days of the date of the accident and to file a claim within ninety days of the "date the loss occurred." *Id.* at 692. The full provision provides,

> Written proof of loss must be furnished to the Company within 90 days after the date of loss. . . . Failure to furnish written proof of loss within the time frame required neither invalidates nor reduces any claim if it was not reasonably possible to give proof within such time, . . . provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity of the claimant, later than one year from the time proof is otherwise required.

*Id*. at 401. Mr. Rasenack's claim was filed outside the ninety-day period but within the extended period, *i.e.*, within one year and ninety days.

[3] The Plan gives claimants sixty days to submit an appeal from the date of the notice of claim denial.

within sixty days unless special circumstances require an extension of an additional sixty days. On August 3, 2006, several months past the four-month deadline for a decision on appeal, Ms. Tribolet and Mr. Rasenack filed a complaint in federal district court seeking a declaration that Mr. Rasenack is entitled to benefits and an order requiring AIG to pay him benefits under 29 U.S.C. § 1132. On August 31, 2006, AIG belatedly denied the administrative appeal.[4]

On cross motions for summary judgment, the district court denied Mr. Rasenack's motion and granted AIG's. The court determined, as a matter of first impression, that the proper standard of review of the administrative decision was arbitrary and capricious, not *de novo* as plaintiffs urged. The court held that AIG's interpretation of the term "hemiplegia" was reasonable, and that there was substantial evidence that Mr. Rasenack's condition did not meet the policy's definition.

On appeal, Mr. Rasenack argues (1) the correct standard of review of the plan administrator's decision is *de novo* and (2) the administrative record establishes that he suffers from hemiplegia as defined by the policy and is therefore eligible for benefits.

---

[4] The Plan has two additional levels of administrative review, but because AIG did not notify Mr. Rasenack of the status of his appeal within the Plan's deadline, he was considered to have exhausted his administrative remedies. *See* 29 C.F.R. § 2560.503-1.

## II.

We review *de novo* the "district court's determination of the proper standard to apply in its review of an ERISA plan administrator's decision . . . ." *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1167 (10th Cir. 2006). ERISA authorizes a judicial action challenging an administrative denial of benefits but does not specify the standard of review that courts should apply. *See* 29 U.S.C. § 1132(a)(1)(B). Applying the principles of trust law, the Supreme Court resolved this question in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), holding that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." The parties do not dispute that the Plan grants AIG this discretionary authority. The Plan provides, "The insurance company retains sole and absolute final discretion to determine eligibility for benefits, to construe the terms of the policy and to resolve any factual issues relevant to benefits." Aplt. App. at 329.

Under trust principles, a deferential standard of review is appropriate when trustees actually exercise a discretionary power "vested in them by the instrument under which they act." *Firestone*, 489 U.S. at 111. Following *Firestone*, we made clear in *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631 (10th Cir. 2003), that "not only must the administrator be given discretion by the plan, but

-6-

the administrator's decision in a given case must be a valid exercise of that discretion." *Accord Jebian v. Hewlett Packard Co.*, 310 F.3d 1173, 1176-77 (9th Cir. 2002)); *Nichols v. Prudential Ins. Co. of Am.,* 406 F.3d 98, 109 (2d Cir. 2005); *Gritzer v. CBS, Inc.*, 275 F.3d 291, 296 (3rd Cir. 2002); *Matuszak v. Torrington Co.*, 927 F.2d 320, 322-23 (7th Cir. 1991) (applying *de novo* review where administrator only offered "reasons" for denial during the course of litigation); Restatement (Second) of Trusts § 187, cmt. (h) ("[I]f the trustee without knowledge of or inquiry into the relevant circumstances and merely as a result of his arbitrary decision or whim exercises or fails to exercise a power, the court will interpose.").

The question before us in *Gilbertson* was "whether a plan administrator with discretionary authority whose delay in deciding a claim results in its being 'deemed denied' is entitled to judicial deference." *Gilbertson*, 328 F.3d at 631. We concluded that deference was not required, explaining:

> It follows that where the plan and applicable regulations place temporal limits on the administrator's discretion and the administrator fails to render a final decision within those limits, the administrator's "deemed denied" decision is by operation of law rather than the exercise of discretion, and thus falls outside the *Firestone* exception.

*Id*. By the same analysis, in this case the administrator failed to render a final decision within the temporal limits. Thus, the remedies were "deemed exhausted" by operation of law rather than the exercise of administrative discretion, and

*Firestone*'s rule of deference does not apply.[5]

In holding so, we are not persuaded by AIG's argument that the 2002 amendments[6] to ERISA somehow abrogated the *Gilbertson* rule. The 2002 amendments replaced in part the "deemed denied" provision – which permitted a claimant to file suit if the administrator failed to respond to a claim within a certain prescribed period – with the following paragraph:

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29 C.F.R. § 2560.503-1(k)(l) (2002). This change does not alter our conclusion that when an administrator violates the statutory deadlines incorporated into the plan, *Firestone* deference no longer applies. The 2002 amendments have, however, called into question the continuing validity of the substantial compliance test we have used to avoid creating a rule that would automatically permit *de novo* review for every violation of the deadlines. *Gilbertson*, 328 F.3d at 635; *see also Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 828 (10th Cir. 2008) (leaving open the question whether "a decision made in the absence of the

---

[5] AIG does not dispute that Mr. Rasenack's appeal was considered deemed exhausted under § 2560.503-1(k)(l).

[6] Amendments to 29 C.F.R. § 2560.503-1(h)(1)(i) (1999) took effect in January 1, 2002. *See* 65 Fed. Reg. 70265, 70271 (Nov. 21, 2000).

mandated procedural protections should [] be entitled to any judicial deference."); *Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1175 n.6 (10th Cir. 2004) (same).[7]  Because AIG has failed *Gilbertson*'s substantial compliance test, as we discuss below, we need not decide whether a minor violation of the deadlines or other procedural irregularities would entitle the claimant to *de novo* review under the 2002 amendments.  *See Kellogg*, 549 F.3d at 828 ("We find it unnecessary to conclusively decide the continuing validity of the 'substantial compliance' rule because, even assuming its continued existence, there can be little doubt that MetLife was not in 'substantial compliance' with the ERISA deadlines.")

In *Gilbertson*, 328 F.3d at 634, we noted that "courts have [] been willing to overlook administrators' failure to meet certain procedural requirements when the administrator has substantially complied with the regulations and the process as a whole fulfills the broader purposes of ERISA and its accompanying regulations."  Under this "substantial compliance" exception, "in the context of an ongoing, good faith exchange of information between the administrator and the

---

[7] Mr. Rasenack has also directed our attention to the Department of Labor's ("DOL") explanatory language accompanying the notification of the final rule revising 29 C.F.R. § 2560.503-1(h)(4) – the predecessor regulation to 29 C.F.R. § 2560.503-1(l ): "[DOL's] intentions in including [§ 2560.503-1(k)(l )] in the proposal were to clarify that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference." ERISA Claims Procedures, 65 Fed. Reg. 70246, 70255 n.39 (Nov. 21, 2000).

claimant, inconsequential violations of the deadlines or other procedural irregularities would not entitle the claimant to *de novo* review." *Id.* We elaborated: "an administrator who fails to render a timely decision can only be in substantial compliance with ERISA's procedural requirements if there is an ongoing productive evidence-gathering process in which the claimant is kept reasonably well-informed as to the status of the claim and the kinds of information that will satisfy the administrator." *Id.* at 636. Pursuant to this test, a plan administrator is in substantial compliance with a deadline if the delay is: "(1) 'inconsequential'; and (2) in the context of an on-going, good-faith exchange of information between the administrator and the claimant." *Finley*, 379 F.3d at 1173-74.

Mr. Rasenack submitted his claim on July 21, 2004. The nurse hired by AIG to interview Mr. Rasenack met with him on December 14, 2004, and submitted her report the next day. Following receipt of the nurse's report, AIG requested an outside review of Mr. Rasenack's medical record. The reviewing physician submitted his opinion letter on February 26, 2005, the last date of notable activity until AIG's November 15, 2005 claim denial eight months later. While AIG did contact Ms. Tribolet on July 18, 2005 with an administrative update, we do not consider a single contact over such a long span of time to be an "on-going, good faith exchange of information." *Id.* Mr. Rasenack's appeal was met with similar delays. The appeal was filed on January 13, 2006, and a second

reviewing physician submitted a report on May 15, 2006, but the appeal was not denied until August 31, 2006.

AIG has not offered any explanation for these delays, other than to point out that in the fall of 2004 it had difficulty contacting Mr. Rasenack and his wife to schedule an interview.[8] But the interview was successfully completed in December 2004, and the claim was not denied until November 2005. In sum, we agree with the district court's assessment that "the Administrator's delays in the initial and appellate decisions were months beyond the deadlines imposed by the Policy and ERISA and not simply the result of delays by Plaintiffs, which amounted to a few weeks at most, or a good faith exchange of information." Aplt. App. at 749. Based on the foregoing, we conclude that AIG has not met the substantial compliance standard, and AIG's delays in denying both the initial claim and the appeal are not excusable.

Finally, AIG argues that *de novo* review under *Gilbertson* only applies where the administrator never issued a final decision on the merits. Because AIG eventually did deny both Mr. Rasenack's initial claim and his appeal, AIG reasons, the proper standard is arbitrary and capricious. We have not previously

---

[8] AIG also notes Mr. Rasenack's initial delay in submitting his claim, but does not explain how the delay interfered with the processing of his claim. Although the Plan advises claimants that delay in submitting the claim might result in delays in processing, this does not excuse AIG of its duty to follow the deadlines set out in the Plan and in ERISA.

read *Gilbertson*'s holding so narrowly, and we decline to do so here. The fact that AIG finally issued a letter denying Mr. Rasenack's appeal several weeks after Mr. Rasenack filed suit does not distinguish this case from one in which the insurer never issued a final decision. In fact, we applied *Gilbertson* to just such a scenario in *Finley*, 379 F.3d at 1173. There, because the administrator did not respond to the claimant's administrative appeal until after the deadline had passed, the claimant's appeal was considered "deemed denied" under the then-governing ERISA regulations. *Id.* at 1172. We held that *Gilbertson* was applicable and proceeded to consider whether any exceptions to its general *de novo* rule applied. *Id.* at 1174.

The relevant fact is that the administrator failed to "render a final decision within [the temporal] limits" prescribed by the Plan and ERISA. *Gilbertson*, 328 F.3d at 631. As Mr. Rasenack points out, permitting plan administrators to avoid *de novo* review by belatedly denying an appeal after the deadline has passed and the claimant has filed suit would conflict with the ERISA's stated purposes, namely "protect[ing] . . . the interests of participants in employee benefit plans and their beneficiaries, . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). Accordingly, we apply a *de novo* standard of review to Mr. Rasenack's claim for benefits.

## III.

We next turn to the merits of Mr. Rasenack's eligibility for benefits. We review the district court's decision to grant summary judgement *de novo*. *Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1295 (10th Cir. 2000). As to the scope of our *de novo* review, we have sided with the majority of our sister circuits in agreeing with the Fourth Circuit that "the best way to implement ERISA's purposes in this context is ordinarily to restrict *de novo* review to the administrative record, but to allow the district court to supplement that record 'when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision.'" *Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1202 (10th Cir. 2002) (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993) (en banc)).

### A. *Policy Construction*

Our first task is to determine whether the policy is ambiguous. We interpret the policy according to its plain meaning. *Kellogg*, 549 F.3d at 829. Under federal common law, "the proper inquiry is not what [the provider] intended a term to signify; rather, we consider the common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the words to mean." *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1249 (10th Cir. 2007) (internal quotation marks and alterations omitted).

-13-

"Ambiguity exists when a plan provision is reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of the term." *Admin. Comm. of Wal-Mart Assocs. Health & Welfare Plan v. Willard*, 393 F.3d 1119, 1123 (10th Cir. 2004) (internal quotation marks omitted). The doctrine of *contra proferentem*, which construes all ambiguities against the drafter, applies to *de novo* review of ERISA plans. *Miller*, 502 F.3d at 1249, 1253. "ERISA imposes upon providers a fiduciary duty similar to the one trustees owe trust beneficiaries. Just as a trustee must conduct his dealings with a beneficiary with the utmost degree of honesty and transparency, an ERISA provider is required to clearly delineate the scope of its obligations." *Id.* at 1250 (internal citation omitted). Finally, "the insured has the burden of showing that a covered loss has occurred, while the insurer has the burden of showing that a loss falls within an exclusionary clause of the policy." *Pitman*, 217 F.3d at 1298.

Mr. Rasenack contends the policy's hemiplegia provision is ambiguous. He argues the policy's definition of hemiplegia as "complete and irreversible paralysis" is wholly dependent on the meaning of "paralysis," which the policy does not define. AIG responds that the definition of hemiplegia carries a plain meaning, *i.e.*, that the entire arm and leg of one side of the body must be "completely paralyzed." Aple. Br. at 36. AIG explains how it arrived at this interpretation:

AIG, based on guidance from medical experts, determined that

-14-

"complete and irreversible paralysis" on one side of the body means "no movement at all of the left or right side." AIG determined that the Plan required that, as a *necessary condition* of such paralysis, there be no movement in the relevant extremities. Lack of sensation or weakness might also be present in paralysis, but the fundamental underlying requirement for benefits for hemiplegia was that there be "no movement at all" of the entire arm and entire leg of the same side of the body, and that such paralysis be "complete and irreversible."

*Id.* at 31 (emphasis in original, internal citation omitted). In other words, "anything less than 'no movement at all' would not be 'complete' paralysis." *Id.*

We agree that the policy is ambiguous for its failure to define paralysis. AIG's interpretation of paralysis as limited to the absence of movement may be reasonable. But "the question that confronts us is not whether their interpretation is reasonable, but whether there is more than one reasonable interpretation of the Plan." *Miller*, 502 F.3d at 1252. Mr. Rasenack points us to Mosby's Medical Dictionary, which defines "paralysis" as "the loss of muscle function, loss of sensation, or both" and "complete paralysis" as "paralysis characterized by a complete loss of motor function." MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 405, 1277 (6th ed. 1994). "Motor" is defined as "1. pertaining to motion, the body apparatus involved in movement, or the brain functions that direct purposeful activities[;] 2. pertaining to muscle, nerve or brain center that produces or subserves motion." *Id.* at 1123. "Function" is defined as "1. an act, process or series of processes that *serve a purpose*[;] 2. *to perform an activity or to work properly or normally*." *Id.* at 712 (emphasis

added). Other medical dictionaries similarly define paralysis in terms of loss of muscle function or sensation, not as the absence of all movement. *See, e.g.*, MATTHEW BENDER ATTORNEYS' DICTIONARY OF MEDICINE P-58 (2008) (defining "paralysis" as a "condition marked by loss of muscle function, i.e., by the inability of the muscles to contract" and noting "[l]ess frequently, the term paralysis applies to a loss of sensation"). *See also* WEBSTER'S NEW INTERNATIONAL DICTIONARY 1637 (3d ed. 1971) (defining "paralysis" as "a complete or partial loss of function involving the power of motion or of sensation in any part of the body"). In fact, the Summary Plan Description ("SPD") contains a chart classifying the various types of "accidental loss" in which it describes hemiplegia as the loss of "use of both upper and lower limb on same side of body." Aplt. App. at 685. We conclude that there is more than one reasonable interpretation of the meaning of paralysis, and the Plan is thus ambiguous for its failure to define the term. *See Miller*, 502 F.3d at 1252-53.

AIG suggests that the Plan's definition of hemiplegia as "*complete and irreversible* paralysis" saves it from ambiguity. But "complete and irreversible" modifies "paralysis," and therefore the definition still rests on the meaning of "paralysis." We therefore apply the doctrine of *contra proferentem* and strictly construe the ambiguity against AIG. *Id.* at 1253. We have explained the policy rationale behind *contra proferentem*: "Strictly construing ambiguous terms presents ERISA providers with a clear alternative: draft plans that reasonable

-16-

people can understand or pay for ambiguity." *Miller*, 502 F.3d at 1255. Here, AIG easily could have defined "paralysis," the key term in the definition of hemiplegia. It seeks to limit the definition to the absence of movement, but the term is not so limited in medical dictionaries and AIG did not so define it. Strictly construing the policy language against AIG, we consider "complete and irreversible paralysis" to mean the complete and irreversible loss of muscle function or sensation, *not* the absence of all movement.[9]

The final matter regarding construction of the policy concerns the Plan's requirement that the loss occur "to an Insured Person within 365 days of the accident." Aplt. App. at 341; *see also* Summary Plan Description, Aplt. App. at 686 ("To be eligible for benefits, the covered loss must occur within one year from the date of the accident."). Mr. Rasenack interprets this provision to mean we may only consider his medical state during the first 365 days following his accident. On appeal, AIG does not object to this interpretation; in fact, AIG

---

[9] AIG argues that under *Miller*, we may only construe the plan against the drafter where no extrinsic evidence illuminates its interpretation. We recognized in *Miller* that "[w]here a plan's language is ambiguous on its face, courts may turn to extrinsic evidence of parties' intent to create vested insurance benefits." 502 F.3d at 1253. AIG contends, "the Plan clearly defined hemiplegia as requiring 'complete and irreversible paralysis,' in recognition of the fact that the Plan is an accidental death and dismemberment plan, not a disability plan." Aple. Br. at 38. But this statement ignores the fact that AIG itself – both in the Plan and in the SPD – repeatedly refers to the relevant portion of the Plan as an "Accidental Dismemberment *and Accidental Paralysis* Benefit." Aplt. App. at 359 (emphasis supplied). Furthermore, this assertion in large part begs the question: What constitutes "complete and irreversible paralysis"?

included this phrasing in the questionnaire it sent to one of the reviewing physicians, asking whether "the paralysis occur[red] within 365 days of the May 21, accident date." *Id.* at 84. We note, however, that AIG did not limit its review to the 365-day period; the administrative denial references Mr. Rasenack's "progress in the last couple of years." *Id.* at 69.

## B. *Review of the Administrative Record*

Resolving the Plan's ambiguity in Mr. Rasenack's favor, we proceed to our review of the record. The first piece of relevant information is a pre-admission assessment dated June 20, 2003, performed by Nurse Karen Hildebrand from Craig Hospital. She noted that Mr. Rasenack had no volitional or spontaneous movement on his left side and only very limited movement in his right upper and lower extremities. On July 1, in a referral update, Nurse Hildebrand noted that Mr. Rasenack's left side remained "plegic." On July 7, the date of Mr. Rasenack's admission to Craig Hospital, Dr. Weintraub wrote in the section entitled "History of Present Illness": "He is moving the right upper extremity more so than the lower extremity and *does not move the left side*." *Id.* at 240 (emphasis added). In the "Neurologic" section, Dr. Weintraub recorded: "The left upper extremity is *plegic and spastic*, held in an extensor position. Left lower extremity is *plegic as well, spastic and hyperreflexic*. . . . He had a painful sense with pressure throughout the entire left extremities." *Id.* at 243 (emphasis

-18-

added).  Under "Impressions," Dr. Weintraub noted Mr. Rasenack's condition as "bilateral hemiparesis, left worse than right."  *Id.*[10]

A brain injury evaluation performed by a physical therapist at Craig Hospital on October 10, 2003, noted that Mr. Rasenack required assistance for all functional mobility and had "limited left upper extremity uses."  *Id.* at 248.  An Outpatient Rounds Note, dated October 21, 2003, describes Mr. Rasenack's progress after one week of outpatient care:

> PT reports that the patient is physically making good progress.  He is now minimum assist for squat pivot transfers . . . .  He is, in therapy, walking in the parallel bars for two lengths, which is approximately 30 feet, with minimum assistance and verbal cues. . . .  The patient can do most self-care right-handed and *uses his left for a stabilizer*.  Active movement is increased in his left upper extremity muscle groups, which is important as the patient was left dominant.

*Id.* at 160 (emphasis added).  In a Clinic Note dated November 12, 2003, Dr. Weintraub observed:

> Hans-Gerd is making nice progress.  He is improving in his ambulation.  He is still using an assistive device.  He is starting to navigate stairs.  He is gaining range of motion and strength of the left side.  He still has limits in range of motion at the left elbow, left knee and ankle that in the future he may need some surgery in this regard.

_____

[10] According to AIG, the records from June 20, July 1, and July 7, 2003, were omitted from the medical records sent from Craig Hospital to AIG.   Thus, they were not in the claims file reviewed by AIG during its initial claim processing; Mr. Rasenack sent them to AIG when he filed his appeal in January 2006.  Because they were before the agency on appeal, they are therefore part of the administrative record.

*Id.* at 154. On February 20, 2004, Dr. Weintraub noted, "We discussed the eventual goal of household ambulation with a walker. . . . We anticipate the need for wheelchair use for longer distances, etc. over the next six months." *Id.* at 141.

Nurse Kellianne Boris, hired by AIG to assist with the processing of Mr. Rasenack's claim, interviewed him in December 2004, seven months after the 365-day period had passed. Mr. Rasenack remained belted into a wheelchair for the duration of the interview, and Nurse Boris did not observe any leg movements. He did occasionally squeeze a therapy ball with his left hand, but she did not see him make any other motions with the left hand. *Id.* In correspondence with AIG, Nurse Boris advised that Dr. Weintraub used the term "hemiparesis," but that it "means the same as hemiplegia." *Id.* at 111.

We turn next to the assessments of Dr. Weintraub, Mr. Rasenack's treating physician, and Drs. Ronald DeVere and James Sarno, the physicians hired by AIG to review Mr. Rasenack's file. When Dr. Weintraub was asked by AIG in October 2004 whether Mr. Rasenack suffered hemiplegia, he responded affirmatively, "Yes, the accidental injury . . . did result in hemiplegia." *Id.* at 170. He stated that "Mr. Rasenack's paralysis does appear to be complete and irreversible, although from a quantitative standpoint, he has benefitted from rehabilitation treatment." *Id.*

In February 2005, AIG sought review from an outside physician. It sent Dr. DeVere the claim file as well as a series of questions to complete. We quote

AIG's questions (indicated by italics) and Dr. DeVere's answers at length, as they

are instructive:

> 1. *Did Mr. Rasenack sustain any of the above paralysis conditions as a direct result of the May 21, 2003 accident?* According to the medical records, the best that I can tell from the detailed review is that this claimant was comatose and very poorly responsive the first few weeks of his hospital stay after the injury. . . . It appears from his current evaluations and throughout his progress in the last couple of years, that he currently has a left hemiparesis involving the left arm and left leg. Hemiparesis is a weakness of the left arm and leg, or right arm and leg, i.e., weakness in one side of the body due to a disturbance in brain function. . . . He does not appear to be hemiplegic, which means no movement at all of the left or right side. . . . [I]t appears that the claimant has some movement and strength in [the] left arm and leg, which classifies the weakness as hemiparesis.
> 2. *Did the paralysis occur within 365 days of the May 21 accident date?* It appears that the hemiparesis, which is the term that I am using, occurred within 365 days of the May 21, 2003, accident date.
> 3. *Does he have complete and irreversible paralysis of the entire limbs? . . .* According to the recent notes of November of 2004[,] the claimant still continued to have hemiparesis. The exact details of that weakness are not evident on review of the record. There is no detailed evaluation of specific muscle groups in his left arm and leg in regard to how much weakness there is. Hemiparesis is the only term used. I cannot give you a definite description of function of his left arm and leg muscles because of the incompleteness of records available for my review at this time. After this length of time, which is almost two years, there is a remote possibility that he could make a little bit more improvement. But more likely than not, he would not improve much more in his weakness of his left upper and left lower extremities after the next months.
> 4. *If the paralysis is not complete, but permanent, please indicate his level of functioning regarding activities of daily living, ambulation, and transfer?* [M]ost likely his hemiparesis is likely permanent, but not complete. The exact level of functioning of his left arm and leg and capabilities is poorly described in the medical records that I have reviewed. The best I can state from the information available to me is that the claimant still requires continued assistance and supervision for all of his activities of daily

living . . . . It appears that he has some function of his left upper and left lower extremities that enable him to assist in these activities of daily living. . . . Unfortunately, the specific functional abilities of his left arm and leg are not well documented or described in this record to give you any further information. . . .

6. One of the letters from the insurance company to one of the claim examiners asked about Dr. Weintraub's response that the accident resulted in hemiplegia with severe balance and coordination difficulties and the paralysis appears complete and irreversible. As stated previously, in all medical probability, I believe that the current state of the claimant is a hemiparesis, which I have already defined, and which may very well be complete and irreversible at this point in time, the beginning of 2005.

*Id.* at 83-85.

Dr. DeVere undoubtedly concluded that Mr. Rasenack suffered from hemiparesis, not hemiplegia, a distinction that became the basis for AIG's denial of Mr. Rasenack's claim. It is less clear whether or not Dr. DeVere considered Mr. Rasenack to be completely and irreversibly paralyzed. He did not say, for example in response to Question 2, that because Mr. Rasenack has hemiparesis, he is not paralyzed. Rather, Dr. DeVere predicts that the "weakness" will not improve much. *Id.* at 84. In response to Question 4, he indicated that the hemiparesis is permanent but not complete, but then later that it "may very well be complete and irreversible." *Id.* at 85. Significantly, he stressed repeatedly that the records were insufficient regarding the exact level of functioning of Mr. Rasenack's left arm and left leg. Finally, the file Dr. DeVere reviewed did not contain the medical records from Craig Hospital dated June 20, July 1, and July 7, 2003, which were notable as early assessments of Mr. Rasenack's condition.

-22-

AIG hired a second outside physician, Dr. Sarno, to review Mr. Rasenack's file while the appeal was pending. AIG asked Dr. Sarno whether the accidental injury resulted in hemiplegia. He responded:

> No. . . . This claimant is a hemiparetic with the left lower extremity worse than the left upper extremity. The left lower extremity is spastic and rigid and demonstrates a righting reaction which keeps him up. The left upper extremity is also spastic and limited. However, he is able to use it somewhat in helping the right side in various activities of daily living. Although he was a left handed individual prior to this[,] he can no longer use that left hand the way he did previously. Hemiplegic means paralysis of one side of the body. There was no paralysis of either side. He is able to use the left side. . . . The word hemiparesis applies to this situation. The fact that he had sensory loss has nothing to do with hemiplegia. That is a hemisensory dysfunction based on the injury to the sensory parietal cortex vs. the posterior frontal cortex for motor activity.

*Id.* at 397. In response to the question, "Is the paralysis complete and irreversible," Dr. Sarno concluded, "The claimant has made significant strides. Nonetheless he has a significant hemiparesis on the left side. *This will be permanent.* He may have some slight improvement but beyond what he has presently I doubt that there will be much more improvement." *Id.* (emphasis added). In the "comment" section, Dr. Sarno wrote, "This person is one who sit[s] on [the] cusp, enough to be called hemiparetic and not enough to be hemiplegic or uniplegic. He is . . . severely disabled and will be disabled permanent [sic] and totally but just outside the meaning of this policy." *Id.* at 398.

Ms. Trioblet submitted a detailed affidavit regarding her husband's

condition. She reported that he had no control over or sensation in the left side of his body during the 365 days following the accident. She explained that the references to movement in the medical record refer to therapists placing Mr. Rasenack's arms and legs in a passive motion machine. She provided the following chronology:

> At the time he transferred to Craig Hospital, [Hans-Gerd] could move only his right hand and occasionally but not consistently, he could twitch the toes of his right foot. The left side of his body, including left arm and left leg, remained paralyzed. . . . Throughout the 365 days after the accident, Hans-Gerd did not have muscular control or sensation in his left arm and left leg. . . . From a standing position, Hans-Gerd learned to lift his left foot off the floor and swing it forward with his hips. His left leg and left foot remain straight and stiff during this motion. He swings his left leg in a semi-circular arc so it lands in front. He maintains balance by grasping my shoulder with his right hand. Hans-Gerd uses his stiff left leg to bear weight like an amputee uses a prosthesis. This imitation of "walking" is only possible with assistance from me or a therapist. Using a walker for support, Hans-Gerd can move forward, if I am beside him or behind him to give verbal cues and prevent falls. Without a walker and human assistance, Hans-Gerd cannot walk.

*Id.* at 222-23.

The overall picture that emerges from the record is that Mr. Rasenack was unable to move his left arm and leg immediately after the accident but made some gains in mobility and strength as a result of intense physical therapy over the course of the year following the accident. In the letter to Mr. Rasenack denying his claim for benefits, AIG explained its decision:

> After careful review of the information received, we have determined that we must decline payment of this claim as there is no evidence in

the information received that you sustained a complete and irreversible paralysis of your limbs. Rather, it appears that you have hemiparesis and are not paraplegic or hemiplegic.

*Id.* at 69. AIG provided a similar explanation in its letter denying Mr. Rasenack's administrative appeal: "The Committee reviewed the entire administrative records of this claim and concluded that the record contains substantial evidence that Hans-Gerd Rasenack did not sustain a complete and irreversible paralysis of his limbs . . . . Rather, it appears that he has hemiparesis and is not paraplegic or hemiplegic." *Id.* at 402. In the section entitled "Pertinent Facts," AIG also noted, "In addition, you failed to file the Proof of Loss and Notice within the time line set forth in the Policy and Summary Plan description." *Id.* at 402.

## C. Analysis

Although the insured ultimately carries the burden of showing he is entitled to benefits, the plan administrator has a fiduciary duty to the insured to conduct an investigation and to seek out the information necessary for a fair and accurate assessment of the claim. *See Gaither v. Aetna Life Ins.*, 394 F.3d 792, 807-08 (10th Cir. 2004) ("While a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them."). As we made clear in *Gaither*, "An ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter." *Id.* at 808. The Supreme Court recently explained:

-25-

> ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon a plan administrator, namely, that the administrator "discharge [its] duties" in respect to discretionary claims processing "*solely in the interests of the participants and beneficiaries*"of the plan, § 1104(a)(1); it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators "provide a 'full and fair review' of claim denials," *Firestone*, 489 U.S. at 113 (quoting [29 U.S.C.] § 1133(2)); and it supplements marketplace and regulatory controls with judicial review of individual claim denials, *see* § 1132(a)(1)(B).

*Metro. Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2350 (2008) (emphasis added).

Following receipt of Mr. Rasenack's administrative appeal, which included a detailed affidavit from Ms. Tribolet regarding the extent of her husband's paralysis and records from Craig Hospital indicating paralysis on Mr. Rasenack's left side, AIG performed no further investigation, instead sending the records to a second reviewing physician. AIG's decision not to investigate Mr. Rasenack's appeal is especially perplexing given its first reviewing physician's insistence that the records were inadequate to determine the motor function of Mr. Rasenack's left arm and left leg, as we quoted above. This is no small detail because an accurate assessment of the specific functional abilities of Mr. Rasenack's left arm and leg is precisely what resolution of his claim required. But rather than having Mr. Rasenack actually examined by an outside physician or asking Dr. Weintraub to explain Mr. Rasenack's condition in more detail, AIG sent the very same inadequate claim file to a second physician to review from afar.

"Nothing in ERISA requires plan administrators to go fishing for evidence

-26-

when it has not been brought to their attention that such evidence exists. *Gaither*, 394 F.3d at 804. Here, however, evidence that Mr. Rasenack suffered from hemiplegia *was* brought to AIG's attention. The reports from Nurse Hildebrand, Dr. Weintraub, Nurse Boris, and the affidavit of Ms. Tribolet should have led AIG to inquire further, by requesting additional information from Ms. Tribolet, following up with Dr. Weintraub, or having Mr. Rasenack examined by an outside physician. The claim process is not designed to be adversarial; "indeed, one purpose of ERISA was to provide a nonadversarial method of claims settlement." *Gaither*, 394 F.3d at 807 (quotation marks omitted). Under the specific facts of this case, simply sending another physician a case file that has already been declared inadequate was not sufficient to discharge AIG's fiduciary duty.

AIG's letter denying Mr. Rasenack's claim concluded that "there is *no* evidence . . . that [he] sustained a complete and irreversible paralysis of [his] limbs." Aplt. App. at 69 (emphasis added). This statement makes us question whether AIG considered Dr. Weintraub's determination that Mr. Rasenack's injury did result in hemiplegia and that it appeared "complete" and "irreversible." ERISA does not require plan administrators to "accord special deference to the opinions of treating physicians," nor does it place "a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823 (2003). Here AIG apparently gave Dr. Weintraub's conclusion that Mr. Rasenack suffered

hemiplegia *no* weight.

In *Nord*, the Supreme Court observed that, "[a]s compared to consultants retained by a plan, it may be true that treating physicians, as a rule, have a greater opportunity to know and observe the patient as an individual." *Id.* at 832 (quotation marks and alterations omitted). The Court noted that this rule does not always hold true, for example, when "the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks." *Id.* This case does not fit in either scenario: Dr. Weintraub, a board-certified specialist in Physical Medicine and Rehabilitation and Medical Director of the Brain Injury Program at Craig Hospital, served as Mr. Rasenack's treating physician from the time of Mr. Rasenack's admission to Craig Hospital six weeks after his accident though the entire course of his treatment there. "Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834; *see also Fought*, 379 F.3d at 1001 n.1. Yet AIG's explanation of its denial of the claim and the appeal appear to do exactly that, by failing to even acknowledge Dr. Weintraub's conclusion that Mr. Rasenack suffered complete and irreversible hemiplegia.

It is also unclear whether AIG considered Ms. Tribolet's affidavit. AIG claimed that it reviewed the entire administrative file, but the denial letter does not mention any of the information contained in the affidavit. An ERISA plan

-28-

administrator must give "full and fair consideration" to affidavits submitted by the claimant and his or her relatives. *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1211 (10th Cir. 2006) (holding that a plan administrator's decision to deny benefits without giving consideration to affidavits submitted by the claimant and her relatives was arbitrary and capricious). AIG's apparent failure to do so rendered its consideration of the evidence "impermissibly one-sided." *Id.*

Mr. Rasenack accurately notes that all of the healthcare personnel who actually examined or treated him agreed that he suffers from hemiplegia (including the nurse hired by AIG to interview him), yet their opinions are conspicuously omitted from AIG's denial letters. Comparing AIG's explanations of its decision to deny the claim to the information contained in the administrative record, it appears that AIG cherry-picked the information helpful to its decision to deny Mr. Rasenack's claim and disregarded the contrary opinions of the medical professionals who examined, treated, and interviewed Mr. Rasenack. *Cf. Glenn*, 128 S.Ct. at 2352 (noting with approval lower court's treatment of the plan administrator's emphasis of medical reports favorable to a denial of benefits and de-emphasis of unfavorable reports as a serious concern). "ERISA and the Secretary of Labor's regulations under the Act require 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denials." *Nord*, 538 U.S. at 825 (citing 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1 (2002)). As we emphasized in *Gilbertson*, 328 F.3d at 635 (quoting

-29-

*Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997)).:

> "In simple English, what [29 C.F.R. § 2560.503-1(f)] calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied the reason for the denial must be stated in reasonably clear language[,] if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this: it's how civilized people communicate with each other regarding important matters."

AIG justified its decision to deny coverage with the conclusion that Mr. Rasenack had "hemiparesis," not "hemiplegia." Although the administrative record does contain notes from Dr. Weintraub stating that Mr. Rasenack has hemiparesis, it is not clear that Dr. Weintraub drew a firm distinction between hemiplegia and hemiparesis, and the nurse hired by AIG concluded he meant hemiplegia. Dr. Weintraub responded affirmatively when asked specifically whether Mr. Rasenack suffered from hemiplegia. AIG did not follow-up with Dr. Weintraub on this matter, instead asking its reviewing physicians to explain the difference between the two conditions. Given AIG's failure to perform a more thorough investigation and to credit the evidence submitted by Mr. Rasenack supporting a diagnosis of hemiplegia, we are not persuaded the references to hemiparesis and the conclusions of the reviewing physicians provide a sufficient grounds for AIG's denial of Mr. Rasenack's claim for benefits.

*D. The Remedy*

Based on the foregoing analysis, we reverse and remand to the district court for reconsideration under a *de novo* standard of review. *See Gilbertson*, 328 F.3d at 636-37 (reversing and remanding to district court for application of *de novo* review); *Vanderklok v. Provident Life & Accidental Ins. Co.*, 956 F.2d 610, 617 (6th Cir. 1992) (remanding to district court with instructions to take additional evidence and reconsider plaintiff's claim). In the event of a reversal, AIG asks us to remand the case to the plan administrator, but we decline to do so. The cases cited by AIG in support of its argument for remand were applying an arbitrary and capricious standard of review and are fully distinguishable from the present case. *See Rekstad*, 451 F.3d at 1121 (remanding to plan administrator for full consideration of all the evidence in the record); *Caldwell v. Life Ins. Co.*, 287 F.3d 1276, 1289 (10th Cir. 2002) (remanding for administrative interpretation of the plan and further findings of fact). We agree with the Fourth Circuit's conclusion that under *de novo* review, remand to the administrator is an available remedy but is not always the appropriate one. *Quesinberry*, 987 F.2d at 1025 n.6 (4th Cir. 1993) (en banc) ("We do not believe . . . that remand [to the plan administrator] in every case of an inadequate record is consistent with the *de novo* standard of review or in the interests of judicial economy."). AIG's delay in responding to Mr. Rasenack's claim and administrative appeal resulted in his claim being deemed exhausted, depriving him of two additional levels of administrative appeal and forcing him to seek judicial review. *See Vanderklok*,

956 F.2d at 617 (holding that because the plan administrator failed to provide timely written notice of its denial of benefits, therefore preventing the claimant from supplying additional information and seeking administrative review, the plan administrator was "not entitled to the protections concerning administrative review"). AIG had its chance to exercise its discretion and it failed to do so in accordance with the clear guidelines of the Plan and ERISA. Under these circumstances, we conclude that remand to the district court is the most appropriate remedy.

As noted above, a court conducting *de novo* review of an ERISA plan administrator's decision may supplement the record "when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Hall*, 300 F.3d at 1202 (quoting *Quesinberry*, 987 F.2d at 1025). We have listed as an example of one such circumstance "claims that require consideration of complex medical questions or issues regarding the credibility of medical experts." *Id.* at 1203 (quoting *Quesinberry*, 987 F.2d at 1027). In light of our conclusion that the administrative record is inadequate for a full consideration of Mr. Rasenack's eligibility for benefits given the lack of information on the specific functional abilities of his left arm and leg during the relevant time period, the district court should supplement the record with additional evidence as it deems necessary and appropriate to make a proper determination of the extent of Mr. Rasenack's disability.

## IV.

For the foregoing reasons, we **REVERSE** and **REMAND** for further consideration of Mr. Rasenack's claim consistent with this opinion.