**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 15, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

MARY D.,

    Plaintiff - Appellant,

v.

ANTHEM BLUE CROSS BLUE SHIELD;
ANTHEM UM SERVICES, INC.;
CREDIT SUISSE SECURITIES (USA)
LLC GROUP HEALTH CARE PLAN,

    Defendants - Appellees.

No. 17-4195
(D.C. No. 1:16-CV-00124-DB)
(D. Utah)

_____

ORDER AND JUDGMENT[*]
_____

Before **LUCERO**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

Asserting her rights under the Employee Retirement Income Security Act

(ERISA) of 1974, 29 U.S.C. §§ 1001–1461, plaintiff Mary D. (M.D.) seeks recovery

of residential-treatment benefits for her son, A.D., from Credit Suisse Securities

(USA) LLC Group Health Care Plan (the Plan). The district court reviewed the Plan's

denial of benefits under an arbitrary-and-capricious standard and granted summary

judgment in favor of the Plan and its claims administrator, Anthem UM Services, a

_____

[*] This order and judgment isn't binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. But it may be cited for its
persuasive value. Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

subsidiary fully owned by Anthem Blue Cross and Blue Shield (collectively, Anthem). For the reasons discussed below, we affirm.

## Background

Because this case involves the denial of healthcare benefits—specifically, the denial of coverage for residential treatment of A.D.'s psychiatric disorder—we begin by explaining the terms of the Plan and some of A.D.'s medical history. Further, because this case comes to us after several levels of administrative review and because the standard of review is at issue, we also detail what occurred during the administrative review process and before the district court.

## I.     The Plan

When the events relevant to this appeal transpired, M.D. worked for Credit Suisse Securities. Credit Suisse sponsored the Plan, which is a self-funded employee welfare benefits plan. M.D. elected to participate in the Plan and named her dependent son, A.D., as a beneficiary.

The Credit Suisse Benefits Committee (the Benefits Committee) has "sole and complete discretionary authority" to administer the Plan. App. vol. 2C, 1264 (sealed).[1] But it delegated part of that authority to Anthem. As a result, Anthem has certain administrative responsibilities under the Plan: it determines who is eligible to

---

[1] Via our September 14, 2018 and October 30, 2018 orders, we provisionally granted M.D.'s September 11, 2018 motion to seal volumes 2 through 2K of the appendix. To the extent we quote from these sealed volumes, we have determined the quoted material either appears in the parties' briefs, which the parties did not file under seal, or isn't sensitive. *Cf.* Fed. R. Civ. P. 5.2(h) (stating party waives privacy protection for own information by filing not under seal).

participate in the Plan, decides whether an individual will receive benefits, and interprets the terms of the Plan. Nevertheless, the Benefits Committee has the "ultimate responsibility" of administering the Plan. App. vol. 2B, 1056 (sealed).

As relevant here, the Plan covers certain treatments for psychiatric disorders. But to be covered, any treatment—including treatment for such psychiatric disorders—must be medically necessary. And the Plan provides distinct medical-necessity criteria for different levels of psychiatric care.[2] One category of medical-necessity criteria considers the severity of the relevant illness, evaluating the "condition and circumstances" of the individual seeking coverage. App. vol. 2, 461 (sealed). And the severity-of-illness criteria for residential treatment requires the individual seeking coverage to demonstrate, among other things, the following:

1. The [individual] is manifesting symptoms and behaviors [that] represent a deterioration from [his or her] usual status and include either self[-]injurious or risk[-]taking behaviors that risk serious harm and cannot be managed outside of a 24[-]hour structured setting or other appropriate outpatient setting; **AND**

2. The social environment is characterized by temporary stressors or limitations that would undermine treatment that could potentially be improved with treatment while the [individual] is in the residential facility; **AND**

3. There should be a reasonable expectation that the illness, condition[,] or level of functioning will be stabilized and improved

---

[2] The two levels of care relevant to the issues on appeal are residential treatment and acute inpatient treatment. Residential treatment is "specialized treatment that occurs in a residential[-]treatment center. Residential treatment is 24 hours per day and requires a minimum of one physician visit per week in a facility[-]based setting." App. vol. 2, 467 (sealed). Acute inpatient treatment, on the other hand, is "treatment in a hospital psychiatric unit that includes 24-hour nursing and daily active treatment under the direction of a psychiatrist." *Id.* (sealed).

and that a short[-]term subacute residential[-]treatment service will have a likely benefit on the behaviors/symptoms that required this level of care, and that the [individual] will be able to return to outpatient treatment.

*Id.* at 463 (sealed).

The Plan also recommends that before receiving any particular treatment, the individual should request a pretreatment review from Anthem to "make sure the charges are medically necessary." App. vol. 2C, 1324 (sealed). But the Plan doesn't penalize the individual for failing to request pretreatment review. Indeed, the Plan expressly allows the individual to seek medical-necessity review *after* treatment. Nevertheless, the Plan cautions that if the individual seeks a retrospective review, he or she "run[s] the risk of reduced or denied benefits if the claims administrator finds that the care" received "is not medically necessary." *Id.* (sealed). If the individual disagrees with such a finding, the Plan provides level-one and level-two appeals. Anthem conducts level-one appeals. The Benefits Committee conducts level-two appeals.

## II. A.D.'s Medical History and Treatment

A.D. was first diagnosed with generalized anxiety disorder at age nine. His anxiety manifested in various ways: procrastination, perfectionism, rigidity, academic difficulty, and isolationism. In elementary school, he received outpatient treatment from a psychologist.

A.D.'s anxiety escalated over time. In 2013, during his freshman year of high school, A.D. threatened to harm himself with a knife. As a result, he received two

4

weeks of inpatient treatment at a hospital, nearly two weeks of outpatient treatment, and then some additional inpatient treatment. After the second round of inpatient treatment, the hospital suggested A.D. be placed in residential treatment. Despite this recommendation, and with guidance from an education consultant, M.D. enrolled A.D. in a wilderness-therapy program called Aspiro.[3]

A.D. stayed at Aspiro for nine and a half weeks. During that time, psychologist Todd Corelli observed that A.D. had difficulty dealing with his emotions and lacked useful coping skills. Corelli reported that A.D. was often angry, particularly toward his parents. Corelli's observations aligned with A.D.'s father's statement to Corelli that it was hard to manage A.D. at home. Corelli also noted that although A.D. had experienced suicidal thoughts in the past, A.D. reported he hadn't been suicidal in three to four months.

At the end of A.D.'s treatment at Aspiro, Corelli reported that A.D. had benefited from the program. But he recommended sending A.D. to a residential-treatment program, which could provide therapy and support 24 hours a day, so that A.D. could further internalize the improvements he'd made. A.D.'s therapist at Aspiro, Jamie Kaczmarek, echoed Corelli's recommendation for residential treatment. She suggested that without the structure and support of a residential-treatment program, A.D.'s prior difficulties might resurface. Following these recommendations, M.D. sent A.D. to a residential-treatment center called Daniels

---

[3] The Plan's terms specify that "[w]ilderness programs" like Aspiro "are not considered residential[-]treatment programs." App. vol. 2, 467 (sealed).

Academy. She later moved A.D. from Daniels Academy to another residential-treatment center called WayPoint Academy (WayPoint).

WayPoint admitted A.D. based on A.D.'s anxiety disorder and its disruption to his daily life. At intake, WayPoint therapist Brett Walker conducted a suicide-risk screening. He noted that despite previous suicidal ideation, A.D. wasn't currently suicidal and hadn't been suicidal for several months. A.D. denied being suicidal at least twice more while at WayPoint. He remained at WayPoint for ten months.

## III.  Administrative Review Process

### A.  Initial Denial and Level-One Appeal

M.D. didn't request a pretreatment review for medical necessity before WayPoint admitted A.D. for treatment; Anthem first processed a claim for benefits after A.D. had been at WayPoint for several months. Anthem issued an Explanation of Benefits denying benefits because "EITHER NO PRECERT[IFICATION] WAS OBTAINED OR ADDITIONAL INFORMATION HAS BEEN REQUESTED." App. vol. 2, 318 (sealed).

In response, M.D. invoked the administrative review process, submitting a request for either a retrospective benefits determination or a level-one appeal. Along with the request, M.D. submitted invoices from WayPoint and A.D.'s medical records to allow Anthem to "conduct a retrospective review of all of his claims." *Id.* at 315 (sealed). M.D. also asked Anthem to provide her with "specific detailed reasons for [any further] denial." *Id.* at 316 (sealed).

6

As requested, Anthem conducted a retrospective review, which included a review by psychiatrist Narsimha Muddasani. Muddasani noted that after numerous failed attempts to contact WayPoint, he completed his medical-necessity review based on clinical notes in A.D.'s medical records. He found that A.D. had anxiety and poor family interaction; didn't appear actively homicidal or suicidal; wasn't psychotic or medically unstable; wasn't placed on strict suicide watch; and could have been effectively treated in a lower level of care. Ultimately, after applying the medical-necessity criteria for residential treatment, Muddasani concluded that such treatment wasn't medically necessary.

Based on Muddasani's review, Anthem denied benefits. Anthem issued an initial denial letter, stating in relevant part:

> The information your provider gave us does not show that [residential treatment] is medically necessary. You have not caused serious harm to anyone. You have not harmed yourself to such a degree that has caused serious medical problems. You have not had recent treatment for this in a structured outpatient program. You are also likely to benefit from structured outpatient treatment. We based this decision on the health[-]plan guidelines (Psychiatric Disorder Treatment—Residential Treatment Center (RTC) (CG-BEH-03)[)].

App. vol. 2K, 3502 (sealed). Anthem stated M.D. could "request, free of charge, reasonable access to, and copies of all documents, records, and other information, including the . . . medical[-]necessity criteria that were used in making this decision." *Id.* at 3503 (sealed).

7

M.D. then sought a level-one appeal.[4] In her appeal letter, M.D. provided a detailed medical history for A.D. She further provided clinical documentation regarding his treatment history and the recommendations for residential treatment from Corelli and Kaczmarek. M.D. requested a "full, fair, and thorough" level-one review and an explanation from Anthem "regarding the amount of weight [it] gave the clinical evidence . . . when making [its] determinations." App. vol. 2D, 1519 (sealed).

As part of the level-one appeal, Anthem had another psychiatrist, Rasik Lal, conduct an additional medical-necessity review. Lal reviewed M.D.'s letters, Muddasani's findings, Rudo's findings, the initial denial letter, and A.D.'s medical records. Lal found A.D. wasn't actively suicidal or homicidal when admitted to WayPoint; didn't behave in a combative or psychotic manner; didn't require continuous monitoring; wasn't dangerous to himself or others; and didn't present physiological problems or instabilities requiring residential treatment. Thus, like Muddasani before him, Lal concluded that the residential treatment wasn't medically necessary.

---

[4] WayPoint also filed its own level-one appeal with Anthem. As part of that separate appeal, Anthem requested that psychiatrist Andrew Rudo review A.D.'s medical records and apply the medical-necessity criteria for residential treatment. Rudo determined A.D.'s residential treatment at WayPoint wasn't medically necessary, so Anthem denied WayPoint's appeal.

Although the outcome of WayPoint's separate appeal isn't before us, we mention Rudo's review because a later reviewer and the district court both relied in part on his assessment.

Relying on Lal's review, Anthem denied M.D.'s level-one appeal. Anthem stated that in resolving the appeal, it considered all the information that it received in connection with both the retrospective review and this level-one appeal. It further stated:

> Your doctor wanted you to have residential[-]treatment[-]center care. The reason we were given for this was that you were at risk for serious harm without 24[-]hour care. We understand that you would like us to change our first decision. Now we have new information from the medical records and appeal letter from your mother. We still do not think this was medically necessary for you. We believe our first decision was correct for the following reason: You were not at risk for serious harm [such] that you needed 24[-]hour care. You could have been treated with outpatient services. We based this decision on this health[-]plan guideline. (Psychiatric Disorder Treatment—Residential Treatment Center (RTC) (CG-BEH-03)).

*Id.* at 1507 (sealed). Anthem also offered, upon request, "copies of all documents[,] including the actual benefit provision, guideline, protocol, or other similar criterion on which this decision was based." *Id.* at 1509 (sealed).

## B.    Level-Two Appeal

After Anthem denied her level-one appeal, M.D. pursued a level-two appeal before the Benefits Committee. In her appeal letter, M.D. lodged a number of objections to Anthem's retrospective review and level-one appeal. M.D. first pointed out that despite her request, Anthem didn't specify the weight it gave to the treating physicians' opinions or the medical records. She further suggested that Anthem and its reviewers hadn't reviewed A.D.'s medical records at all. And she identified information in those medical records that, according to her, demonstrated that treatment at WayPoint was indeed medically necessary under the Plan's residential-

9

treatment criteria. M.D. next complained that the initial denial letter and level-one appeal denial letter only stated "conclusions" and didn't make "any specific references to the medical records." *Id.* at 1497 (sealed). She requested that the Benefits Committee base its review on the residential-treatment criteria. M.D. also argued that Anthem's reviewers had denial rates that "demonstrate[d] a lack of consideration for what is best for the member." *Id.* (sealed). In support, she pointed to a transcript from a news story that alleged Anthem's reviewers had denial rates from 95 to 100 percent. M.D. asked the Benefits Committee to "tell [her] the denial rates of the last three years for [Lal] as well as [Muddasani]." *Id.* (sealed).

As part of the level-two appeal, the Benefits Committee requested that a physician from the Medical Review Institute of America (MRIoA) analyze whether A.D.'s treatment at WayPoint was medically necessary. The MRIoA physician reviewed the level-two appeal procedures, the residential-treatment criteria, WayPoint's claims, M.D.'s letters, A.D.'s medical records, the prior medical reviewers' determinations, and Anthem's letters. The MRIoA physician initially addressed whether, "[p]er [the American Medical Association] or another professional standard of care," A.D.'s "inpatient confinement in a [residential-treatment center was] supported by" his diagnosis or condition. App. vol. 2K, 3525 (sealed). In answering that question, the MRIoA physician found there was no evidence that A.D. presented an imminent risk of harm to himself or others; he demonstrated no psychotic symptoms; and he exhibited no evidence of deteriorating function. As such, the MRIoA physician determined that "the available

documentation [did] not support a severity of symptoms that would require residential treatment." *Id.* at 3526 (sealed).

The MRIoA physician next addressed whether, "[b]ased on medical records, . . . the patient was at risk for serious harm that constituted [a need for] 24[-]hour care." *Id.* (sealed). As to that question, the MRIoA physician, consistent with Lal and Muddasani, found that A.D. didn't demonstrate a risk of harm to himself or others that warranted 24-hour care. Thus, the MRIoA physician concluded that A.D.'s clinical presentation didn't indicate that residential treatment was medically necessary.

Relying on the MRIoA physician's report, the information M.D. submitted with her appeal letter, the medical records that WayPoint submitted to Anthem, and "the relevant [P]lan provisions," the Benefits Committee denied M.D.'s level-two appeal. *Id.* at 3561 (sealed). The Benefits Committee stated that its "determination was in agreement with Anthem's view that [A.D.'s] clinical presentation did not support the use of residential-treatment care during" his time at WayPoint. *Id.* (sealed). The Benefits Committee also informed M.D. that she had "the right to receive, upon request and without charge, reasonable access to or copies of any relevant documents, records, or other information relied upon" in the level-two appeal. *Id.* (sealed).

## IV. District-Court Proceedings

After exhausting the administrative review process, M.D. filed this lawsuit in district court seeking recovery of benefits. *See* § 1132(a)(1)(B). The parties filed

cross-motions for summary judgment. In ruling on these cross-motions, the district court first determined that because the Plan gave Anthem and the Benefits Committee discretionary authority and because "there were no procedural deficiencies . . . that r[o]se to the level of lessening the standard of review," the arbitrary-and-capricious standard of review applied. App. vol. 1, 223. Second, the district court determined that the opinions of the four reviewing physicians supported the denial of benefits and that the denial wasn't arbitrary and capricious. Thus, the district court denied M.D.'s motion for summary judgment and granted summary judgment to Anthem and the Plan. M.D. now appeals.

## Analysis

M.D. asserts the district court erred by applying the wrong standard of review when it assessed Anthem and the Plan's decision to deny benefits. Specifically, M.D. alleges that rather than deferring to Anthem and the Plan's decision by asking whether it was arbitrary and capricious, the district court should have reviewed Anthem and the Plan's decision de novo.

For the reasons discussed below, we reject this argument and hold that the district court did not err in reviewing Anthem and the Plan's decision under the deferential arbitrary-and-capricious standard. *See infra* Section I. And we further conclude that even assuming the district court *did* err in applying this more deferential standard of review, that error was harmless; Anthem and the Plan's decision to deny benefits survives even de novo review. *See infra* Section II.

12

## I. The Applicable Standard of Review

M.D. contends that the district court erred in applying a deferential standard of review to Anthem and the Plan's decision to deny benefits. "We review de novo the 'district court's determination of the proper standard to apply in its review of an ERISA plan administrator's decision . . . .'" *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009) (alteration in original) (quoting *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1167 (10th Cir. 2006)).

A district court applies de novo review in a benefits-eligibility case "*unless* the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (emphasis added). Where the plan gives the fiduciary or administrator discretionary authority, the district court "employ[s] a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011) (quoting *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010)). But even where the plan affords such discretionary authority to the fiduciary or administrator, deferential review isn't guaranteed: in the face of procedural irregularities in the administrative review process, a district court will instead review the benefits denial de novo. *See LaAsmar*, 605 F.3d at 797; *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631 (10th Cir. 2003).

13

In this case, M.D. concedes that the Plan's terms give the Benefits Committee and Anthem complete discretion to administer it. Thus, the district court would have ordinarily reviewed Anthem and the Benefits Committee's decision for arbitrariness. *Firestone*, 489 U.S. at 115. Nevertheless, M.D. argues that four procedural irregularities in the administrative review process should have triggered de novo review. Specifically, she asserts that (1) Anthem shifted its basis for denying the claim; (2) Anthem and the Benefits Committee failed to engage in a meaningful dialogue with her; (3) the Benefits Committee failed to respond to her request for specific information; and (4) Anthem and the Benefits Committee used the incorrect medical-necessity criteria. We address each assertion in turn.

First, M.D. alleges that Anthem based its denial on "shifting" and "inconsistent" reasons. Aplt. Br. 34. In support, she points out that Anthem initially indicated in the Explanation of Benefits (EOB) that it denied coverage either because M.D. failed to obtain precertification or because Anthem had requested but hadn't yet received certain additional information. Yet Anthem's later denials, M.D. points out, turned on the lack of medical necessity.

But M.D. doesn't explain how these two responses are inconsistent. Critically, the denial in the EOB didn't turn solely on the absence of precertification;[5] instead, it pointed out that in the absence of precertification, Anthem needed additional

---

[5] Indeed, precertification couldn't be the sole basis for the denial in the EOB; the Plan's terms specifically state that there is no penalty for failing to obtain precertification.

14

information to process the claim. That is, the EOB simply sought additional information that would allow Anthem to conduct a retrospective review of whether the treatment was medically necessary and therefore covered under the Plan's terms. Once Anthem conducted that retrospective review using the additional information that M.D. provided—as M.D. specifically asked it to do—it concluded that residential treatment wasn't medically necessary. And after that review, Anthem consistently denied benefits based on medical necessity. Accordingly, Anthem's reasons for denying coverage didn't shift over time, and we reject M.D.'s first procedural-irregularity argument.

M.D. next argues that Anthem and the Benefits Committee failed to engage in a "meaningful dialogue" with her during the administrative process. Aplt. Br. 38. The meaningful-dialogue requirement stems from subsections (g) and (h) of 29 C.F.R. § 2560.503-1.[6] *See Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1168 n.4 (10th Cir. 2007) (stating that requirements in § 2560.503-1(g) and (h) "enable claimants to submit informed responses to the adverse decision and to engage in meaningful dialogue with the plan administrator"); *Gilbertson*, 328 F.3d at 635 (stating that ERISA and its regulations contemplate "meaningful dialogue" between plan administrators and claimants (quoting *Booton v. Lockheed Med. Benefit Plan*,

---

[6] Technically, subsection (g) applies only to notifications of benefits and subsection (h) applies only to appeal denials. *See Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1153 (10th Cir. 2009). But in this case, the Plan's terms make most of the provisions of subsection (g) applicable to notifications of benefits *and* appeal denials, rendering this technical distinction irrelevant.

110 F.3d 1461, 1463 (9th Cir. 1997))). Subsection (g), as incorporated by the Plan, requires in part that any notice of denial must (1) provide the specific reason for the adverse determination, (2) reference the specific provision warranting denial, and (3) for medical-necessity denials, explain the scientific or clinical judgment supporting the determination. Here, the initial denial letter, the level-one appeal denial letter, and the level-two appeal denial letter met these requirements: they cited lack of medical necessity as the specific reason for each denial; they referenced the residential-treatment criteria that governed the medical-necessity determination; and they provided clinical judgment supporting each denial. Thus, none of the letters violate the requirements of subsection (g).

We next turn to subsection (h). That subsection requires every plan to provide claimants "a reasonable opportunity to appeal[,] . . . under which there will be a full and fair review of the claim and the adverse benefit determination." § 2560.503-1(h)(1). Full and fair reviews must, among other things, "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim," and provide "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." § 2560.503-1(h)(2)(iii), (iv). Additionally, in deciding an appeal based on medical necessity, the plan must "consult with a health[]care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." § 2560.503-1(h)(3)(iii).

16

Here, both the level-one and level-two appeal denial letters show that Anthem and the Benefits Committee provided a full and fair review. For instance, Anthem consulted Lal during the level-one appeal, and the Benefits Committee consulted an MRIoA physician during the level-two appeal. Anthem, the Benefits Committee, and the medical reviewers all stated they considered the letters and records that M.D. submitted. And although M.D. asserts that she requested responses to the materials and arguments she submitted, she doesn't cite any authority—nor are we aware of any—that required Anthem and the Benefits Committee to affirmatively *respond* to these submissions. Instead, subsection (h) merely required Anthem and the Benefits Committee to "take[]" these materials and arguments "into account."[7] § 2560.503-1(h)(2)(iv). Moreover, Anthem and the Benefits Committee stated in both appeal denial letters that M.D. could have access to the records they relied on in making the benefits determination free of charge. As such, M.D. hasn't demonstrated that Anthem or the Benefits Committee violated subsections (g) or (h) or failed to engage

---

[7] M.D. cites to *Gaither v. Aetna Life Insurance Co.*, 394 F.3d 792, 802 (10th Cir. 2004), for the proposition that the Tenth Circuit requires "more" than what she characterizes as a "reassuring pat[] on the head" that the plan administrator "considered all of the materials" she submitted. Aplt. Br. 39. But *Gaither*—a case involving the denial of long-term disability benefits, rather than the denial of medical benefits—is inapposite. 394 F.3d at 795. *Compare* § 2560.503-1(g)(1)(v) (requiring denial of medical benefits to include "explanation of the scientific or clinical judgment for the determination"), *with* § 2560.503-1(g)(1)(vii) (requiring denial of disability benefits to include both "explanation of the scientific or clinical judgment for the determination" *and* basis for disagreeing with or not following "views presented by the claimant to the plan of health[]care professionals treating the claimant and vocational professionals who evaluated the claimant").

in a meaningful dialogue at the notification-of-benefits or appeal stages. So we find no procedural irregularity on this basis.

In a related procedural-irregularity argument, M.D. next asserts that the Benefits Committee failed to provide her with certain information during her level-two appeal—specifically, "the denial rates of the last three years" for Lal and Muddasani. App. vol. 2D, 1497 (sealed). In support, M.D. points out that the regulations entitle a claimant to "reasonable access to, and copies of, all documents, records, and other information *relevant to the claimant's claim for benefits*." § 2560.503-1(h)(2)(iii) (emphasis added). Information is relevant to a claim for benefits if it "[d]emonstrates [the administrator's] compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5)." § 2560.503-1(m)(8)(iii). And paragraph (b)(5), in turn, requires the administrator to put procedures in place to ensure both that "benefit claim determinations are made in accordance with governing plan documents" and that the plan is "applied consistently with respect to similarly situated claimants." § 2560.503-1(b)(5).

According to M.D., the denial rates are relevant to her claim for benefits because they could demonstrate whether Anthem complied with procedures that ensure the Plan is properly and consistently applied. To begin, she offers a conditional reason for why the denial rates may show Anthem didn't properly apply the Plan's terms: they "may" show high denial rates for the reviewers. Aplt. Br. 38. In making this argument, M.D. seems to be conflating the broad concept of relevance under the Federal Rules of Evidence with the narrow regulatory definition of

18

relevance in subsection (m)(8)(iii). But these are distinctly different standards of relevance. *Compare* Fed. R. Evid. 401 (stating that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence"), *with* § 2560.503-1(m)(8)(iii) (stating that information is relevant if it "[d]emonstrates [the administrator's] compliance with the administrative processes and safeguards"). And M.D. provides no authority to support her assertion that the denial rates are relevant under the narrower regulatory provision merely because they *might* show Anthem's lack of compliance with safeguards and procedures. Nor have we found any. The regulation states that relevant information is that which *in fact* demonstrates compliance, and M.D. fails to explain how the denial rates meet that standard. We therefore reject M.D.'s argument that the denial rates are relevant to show proper application of the Plan.

Next, M.D. argues that if the denial rates for Lal and Muddasani are substantially different, the disparity may show inconsistent application of the Plan to similarly situated claimants. As an initial matter, this argument suffers from the same infirmity as M.D.'s prior point—it relies on an overbroad definition of relevance. Further, as Anthem and the Plan point out, Lal's and Muddasani's denial rates wouldn't, standing alone, demonstrate that Anthem applied the Plan's terms inconsistently to similarly situated claimants. That's because the denial rates wouldn't shed any light on whether the denied claimants were in fact similarly situated: for instance, denial rates wouldn't show whether the denied claimants were the same age as A.D., whether they were diagnosed with generalized anxiety

19

disorder, or whether they were seeking coverage for residential treatment. Thus, we also reject M.D.'s assertion that the denial rates are relevant to show inconsistent application of the Plan among similarly situated claimants.

In her fourth and final procedural-irregularity argument, M.D. alleges that the medical reviewers for Anthem and the Benefits Committee erroneously used the medical-necessity criteria for acute inpatient care rather than the criteria for residential treatment. For acute inpatient care—which is a higher degree of care than residential treatment—the criteria are more onerous. In particular, the acute-inpatient-care criteria require, among other things, "[i]mminent suicidal risk or danger to others." App. vol. 2, 461 (sealed). But for residential treatment, the criteria require only "self[-]injurious or risk[-]taking behaviors that risk serious harm." *Id.* at 463 (sealed).

In support for her position that the reviewers relied on the former rather than the latter, M.D. points to the reviewers' findings on A.D.'s risk for suicide and homicide, alleging that those findings mirror the criteria for acute inpatient care, not residential treatment.

As an initial matter, we note that Lal, Muddasani, and Anthem all specified the residential-treatment criteria, not the acute-inpatient-care criteria, as the basis for their determination. What's more, none of the reviewers even mentioned the acute-inpatient-care criteria. Neither did Anthem or the Benefits Committee. We see no reason to think these entities identified one set of criteria but applied another. Further, as the district court explained, the criteria for acute inpatient care and

20

residential treatment partially overlap. That is, although Lal, Muddasani, and the MRIoA reviewer implicitly addressed the acute-inpatient-care criteria by finding that A.D. wasn't suicidal or at imminent risk of self-harm when WayPoint admitted him, these findings were also relevant to determining whether, for purposes of applying the residential-treatment criteria, he was engaging in self-injurious or risk-taking behavior that risked serious harm. For instance, a finding that A.D. had repeatedly attempted suicide would necessarily compel the conclusion that he was engaged in self-injurious behavior. Likewise, a finding that A.D. had recently attempted homicide would necessarily compel the conclusion that he was engaged in behavior that risked serious harm to others. Thus, the reviewers' reliance on their findings about the existence or nonexistence of A.D.'s homicidal and suicidal ideations doesn't indicate that they used the incorrect medical-necessity standard.

Moreover, the issue of whether residential treatment is medically necessary turns on more than just risk of harm; it also requires a finding that the individual's disorder can't be properly "managed outside of a 24[-]hour structured setting or other appropriate outpatient setting." App. vol. 2, 463 (sealed). And Lal, Muddasani, and the MRIoA physician found A.D. failed to meet this criterion because he didn't need continuous monitoring and treatment. Likewise, Anthem mentioned A.D.'s failure to satisfy this criterion in the initial denial letter and in the level-one appeal denial letter. Notably, this consideration—whether the disorder can be managed in outpatient care—isn't part of the acute-inpatient-care criteria. Thus, we reject M.D.'s

argument that Anthem and the Benefits Committee procedurally erred by applying the incorrect medical-necessity criteria.

In short, M.D. fails to identify any procedural irregularities in the administrative review process.[8] Accordingly, the district court did not err in applying the arbitrary-and-capricious standard of review.

## II. Denial of Residential-Treatment Benefits

Alternatively, even assuming we agreed with M.D. and concluded that the district court erred in applying the arbitrary-and-capricious standard of review, that conclusion wouldn't necessarily entitle M.D. to relief. Instead, this conclusion would only permit us to reverse the district court's decision outright if M.D. could show that the district court's error prejudiced her—i.e., that it can be reasonably concluded the district court would have reversed the denial of benefits had it reviewed the denial decision de novo. *See* Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009) (noting that in civil cases, "the party seeking reversal normally must explain why the erroneous ruling caused

---

[8] Because we find no procedural irregularities in the administrative review process, we need not address M.D.'s argument that the substantial-compliance doctrine no longer applies under the 2002 version of the ERISA procedural regulations. *See Gilbertson*, 328 F.3d at 634–35 (defining substantial-compliance doctrine as court's willingness to "overlook administrators' failure to meet certain procedural requirements" when administrator "substantially complied with the regulations"); *Rasensack*, 585 F.3d at 1316 ("The 2002 amendments have . . . called into question the continuing validity of the substantial[-]compliance [doctrine] . . . .").

harm"). For the reasons discussed below, we conclude that M.D. cannot make this showing here; even under de novo review, we see no indication that Anthem and the Plan wrongly denied benefits. Thus, even assuming the district court erred in failing to review Anthem and the Plan's decision de novo, that error was harmless.

In performing this prejudice analysis, we review Anthem and the Plan's decision to deny benefits, "as opposed to reviewing the district court's ruling." *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009). In so doing, "[o]ur review is 'limited to the administrative record—the materials compiled by the administrator in the course of making [its] decision.'" *Id.* (quoting *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1003 (10th Cir. 2004)).

As stated above, A.D.'s residential treatment was only covered if it was medically necessary. And under the Plan's terms, residential treatment for a psychiatric disorder is only medically necessary if the individual meets three criteria. First, the individual must manifest deterioration from his or her usual status and demonstrate self-injurious or risk-taking behaviors that risk serious harm and cannot be managed outside of a 24-hour structured setting. We refer to these three requirements collectively as the injury-risk criterion and separately as the deterioration requirement, the behaviors requirement, and the 24-hour requirement. Second, the individual's social environment must have temporary stressors or limitations that could undermine treatment (the social-environment criterion). Third, the individual must reasonably be expected to both stabilize and improve from short-term residential treatment and then return to outpatient treatment. We refer to these

23

two requirements collectively as the reasonable-expectation criterion and separately as the stabilization requirement and the return-to-outpatient-care requirement. M.D. argues that she can meet her burden to establish that A.D. met these criteria and that Anthem and the Plan therefore wrongly denied her claim for benefits. *See Rasenack*, 585 F.3d at 1324.[9]

### 1. The Injury-Risk Criterion

In attempting to show A.D. satisfied the behaviors requirement (i.e., that he displayed self-injurious or risk-taking behaviors that posed a risk of serious harm), M.D. relies exclusively on the opinions of treating medical providers Corelli and Kaczmarek. Corelli and Kaczmarek recommended that A.D. obtain residential treatment after he completed Aspiro's wilderness-therapy program. But ERISA doesn't require an administrator to defer to a treating physician's opinion. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) ("We hold that [under ERISA,] plan administrators are not obliged to accord special deference to the opinions of treating physicians."). Instead, ERISA merely prohibits administrators from "arbitrarily refus[ing] to credit . . . the opinions of a treating physician." *Id.* at 834. Thus, Anthem and the Benefits Committee weren't required to defer to Corelli or Kaczmarek in the face of other credible medical evidence. And they possessed

---

[9] M.D. also faults Anthem and the Benefits Committee for failing to discuss all three of these criteria. But the residential-treatment criteria are conjunctive. That is, the absence of any one criterion would preclude a finding of medical necessity. Thus, because Anthem and the Benefits Committee found that A.D. failed to satisfy the injury-risk criterion, they were not required to address the social-environment criterion or the reasonable-expectation criterion.

other credible evidence in this case, in the opinions from Lal, Muddasani, and the MRIoA reviewer. *See Blair v. Alcatel-Lucent Long Term Disability Plan*, 688 F. App'x 568, 576 (10th Cir. 2017) (unpublished) (finding plan administrator wasn't required to defer to treating physician where credible evidence from file reviewer and primary-care physician supported denial of coverage).

Undeterred, M.D. also argues that because A.D.'s condition involves mental health, "[i]t is especially improper to ignore the findings and conclusions of a patient's treating physician." Aplt. Br. 45. In support, she relies on numerous Sixth Circuit cases that question the reliability of file reviews in benefits disputes related to the treatment of psychiatric disorders. *See*, *e.g.*, *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 611–12 (6th Cir. 2016) ("File reviews are particularly 'questionable as a basis' for an administrator's determination to deny benefits where the claim, as here, involves a mental[-]illness component." (quoting *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 702 (6th Cir. 2014))); *Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 505–09 (6th Cir. 2008) (unpublished) ("Courts discount the opinions of psychiatrists who have never seen the patient for obvious reasons." (quoting *Sheehan v. Metro. Life Ins. Co.*, 368 F. Supp. 2d 228, 255 (S.D.N.Y. 2005))). But we have uncovered no similar caselaw in our circuit, and M.D. points to none. In fact, we have expressly rejected the argument that administrators must defer to treating physicians in the mental-health context. *See Eugene S.*, 663 F.3d at 1134–35 (rejecting appellant's argument that opinion of treating physician is entitled to special

weight in ERISA benefits dispute related to mental-health treatment). Thus, we aren't persuaded that we must depart from the general rule that we need not "accord special deference to the opinions of treating physicians." *Nord*, 538 U.S. at 825; *see also Eugene S.*, 663 F.3d at 1135 (declining plaintiff's "invitation to announce a 'treating[-]physician rule' for ERISA claims relating to mental[-]health care").

Further, even if we were to credit the treating medical providers' opinions, those opinions don't necessarily contradict the conclusion that A.D. wasn't engaging in self-injurious or risk-taking behaviors when WayPoint admitted him. At Aspiro, Corelli noted that although A.D. had suicidal thoughts in the past, A.D. hadn't been suicidal in three or four months. Likewise, once A.D. entered WayPoint, Walker conducted a suicide-risk screening and determined that A.D. hadn't thought of suicide in the previous few months and wasn't currently suicidal or threatening self-harm. And A.D. denied being suicidal at least twice more while at WayPoint. The only real evidence of self-injurious or risk-taking behavior was A.D.'s suicide threat in February 2013—but that occurred approximately six months before he entered WayPoint. Further, and critically, although Corelli and Kaczmarek recommended residential treatment after Aspiro, they did so based on their belief that A.D. needed to internalize the improvements he made at Aspiro, *not* because he was engaged in self-injurious or risk-taking behavior. Accordingly, even assuming Anthem and the Benefits Committee should have deferred to the treating providers, we see no

indication that they would have reached a different medical-necessity conclusion had they done so.[10]

Moreover, contrary to M.D.'s argument that residential treatment was medically necessary because A.D. was engaging in self-injurious and risk-taking behaviors, considerable credible evidence supports the opposite conclusion. Muddasani determined A.D. didn't appear actively homicidal or suicidal; wasn't psychotic or medically unstable; wasn't on strict suicide watch; and could have been treated with a lower level of care. Lal found A.D. wasn't actively suicidal or homicidal when WayPoint admitted him; didn't behave in a combative or psychotic manner; didn't require continuous monitoring; wasn't dangerous to himself or others; and didn't present physiological problems or instabilities requiring residential treatment care. And the MRIoA reviewer stated A.D. didn't demonstrate a risk of harm to himself or others warranting 24-hour care. Also, each reviewer independently concluded A.D. could have been treated with a lower level of care. In turn, based on the reviewers' findings, Anthem and the Benefits Committee concluded that A.D. wasn't engaging in self-injurious or risk-taking behaviors. In

---

[10] In M.D.'s appeal letters, she included additional excerpts from A.D.'s medical records that, according to M.D., support a finding that residential treatment was medically necessary. She doesn't explicitly identify many of these excerpts in her briefing. But we have reviewed the excerpts in her appeal letters and find nothing that would indicate A.D. was displaying self-injurious or risk-taking behaviors that couldn't be managed in an outpatient setting. And even assuming such evidence exists elsewhere in the record, "[n]othing in ERISA requires plan administrators"—or reviewing courts, for that matter—"to go fishing for evidence" that a claimant doesn't "br[ing] to their attention." *Rasenack*, 585 F.3d at 1325 (quoting *Gaither*, 394 F.3d at 804).

sum, then, regardless of whether we credit the treating physicians or the medical reviewers, M.D. hasn't demonstrated that A.D. met this criterion when he entered WayPoint.

Nor has M.D. shown that A.D. met the other part of this criterion—i.e., that he "manifest[ed] symptoms and behaviors [that] represent[ed] a deterioration from [his] usual status"—prior to entering WayPoint. App. vol. 2, 463 (sealed). On this deterioration requirement, M.D. urges us to consider A.D.'s condition not just at the time he entered WayPoint, but "from a more broad[-]spectrum perspective." Reply Br. 22. M.D. doesn't cite any authority for her broad-spectrum point. Nor have we found any. Moreover, the record simply doesn't show that A.D.'s condition was deteriorating at the time he entered WayPoint or in the preceding months. Instead, the record shows that A.D. had been improving. Prior to attending WayPoint, A.D. attended Aspiro and Daniels Academy. Corelli found that A.D. significantly benefited from his time at Aspiro. Kaczmarek likewise noted A.D.'s improvements after Aspiro. Thus, although A.D.'s condition may have deteriorated before attending Aspiro, as M.D. posits, we cannot say that his condition deteriorated before he entered WayPoint.

In sum, we find that the record presents no evidence that A.D. was deteriorating or engaging in self-injurious or risk-taking behavior that couldn't be managed except in a 24-hour structured setting. He therefore fails to satisfy the injury-risk criterion. And because the three medical-necessity criteria for residential treatment are conjunctive, we reject M.D.'s argument that A.D.'s residential

28

treatment was medically necessary. But in the interest of completeness, we briefly address M.D.'s arguments on the remaining two criteria.

### 2.     The Social-Environment Criterion

M.D. next argues that "it is evident that [A.D.] was subjected to temporary stressors or limitations at home that made removal from that social environment necessary." Aplt. Br. 55. Notably, she cites nothing in the record to support this assertion. And although our independent review of the record indicates this may have been true *before* A.D. attended Aspiro, we see no indication this was still the case by the time WayPoint admitted him. Instead, Corelli indicated that A.D. had benefited from Aspiro. Likewise, Kaczmarek noted that upon his discharge from Aspiro, A.D. had stabilized. And because A.D. never went home between leaving Aspiro and entering WayPoint, there's simply no way to know whether his home would have been a temporary stressor or limitation that would have undermined his treatment. Under these circumstances, we conclude that M.D. has failed to demonstrate that when A.D. entered WayPoint, his family remained a "temporary stressor or limitation[]" that would undermine his treatment. App. vol. 2, 463 (sealed); *see also Rasenack*, 585 F.3d at 1324.

### 3.     The Reasonable-Expectation Criterion

In addressing this third criterion, M.D. points to an *absence* in the record of any finding that A.D. failed to satisfy this criterion, rather than to the *presence* of any

record evidence that might support a contrary finding.[11] But the absence of such a finding isn't relevant; it's M.D.'s burden to show that A.D.'s residential treatment was medically necessary, not the administrator's burden to show they determined it wasn't. *See Rasenack*, 585 F.3d at 1324. And M.D. fails to satisfy that burden here.

## Conclusion

For the reasons outlined above, we conclude that the district court didn't err when it reviewed the benefits denial for arbitrariness. Alternatively, even assuming the district court should have reviewed the denial decision de novo, we conclude that the district court's error in failing to do so was harmless; the denial decision survives even de novo review because A.D.'s residential treatment wasn't medically necessary.[12] Accordingly, we affirm the district court's order entering summary judgment in favor of Anthem and the Benefits Committee. As a final matter, we grant M.D.'s motion to seal.

Entered for the Court

Nancy L. Moritz
Circuit Judge

---

[11] M.D. insists she "provided" such "evidence" to Anthem during the review process. Rep. Br. 23. But she neither identifies the specific evidence she provided nor directs our attention to the location in the record where that evidence appears. *Cf.* Fed. R. App. P. 28(a)(8)(A) (requiring appellant to provide "citations to . . . parts of the record" relied on).

[12] Likewise, because M.D.'s wrongful-denial argument fails even under de novo review, we need not separately address whether, as she asserts, the decision to deny benefits was arbitrary and capricious. *See Nance v. Sun Life Assurance Co. of Can.*, 294 F.3d 1263, 1266 (10th Cir. 2002) (finding coverage decision that survived "stringent" de novo review necessarily couldn't be arbitrary and capricious).

30